IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Iverson Wynn (R-43733), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 23-cv-16955 |
| | ) | |
| v. | ) | Honorable Steven C. Seeger |
| | ) | |
| Ronell Harmon, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' ANSWER TO PLAINTIFF'S AMENDED
COMPLAINT AND AFFIRMATIVE DEFENSES**

Defendants, Tyler Boothe and Ronell Harmon ("Defendants"), by and through their attorney, Kwame Raoul, Illinois Attorney General, and pursuant to Rule 8 of the Federal Rules of Civil Procedure, hereby answer Plaintiff's Amended Complaint (ECF 39) as follows:

**JURISDICTION**

1. The court has Jurisdiction over the Plaintiff's claim of violation of federal constitutional rights under 42 U.S.C. § § 1331(1) and 1343.

**ANSWER: Defendants admit that this Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331 (federal question jurisdiction), and 28 U.S.C. § 1343(a)(3) (jurisdiction over 42 U.S.C. § 1983 actions). Defendants object to Plaintiff's citation of "42 U.S.C. §§ 1331(1) and 1343" as inaccurate—no "42 U.S.C. § 1331(1)" exists, and 42 U.S.C. § 1343 is obsolete. Defendants deny that jurisdiction implies a meritorious claim against them.**

**PARTIES**

2. The Plaintiff, Iverson Wynn, was incarcerated at Joliet Treatment Center at all times during the events described in this complaint.

**ANSWER: Admit.**

3. Defendant Ronell Harmon #15223 was one of the six Emergency Response TEAM members at Joliet Treatment Center who responded to a call on Jan. 2, 2023. He is being sued in his individual capacity.

**ANSWER: Admit.**

1

4.      Defendant Tyler Boothe #15149 was one of the six Emergency Response Team members at Joliet Treatment Center who responded to a call on Jan, 2, 2023. He is being sued in his individual capacity.

**ANSWER: Admit.**

## STATEMENT OF FACTS

5.      On Jan. 2, 2023 Inmate Wynn was housed on A-wing in Dorm 8 at Joliet Treatment Center. Correctional Treatment Officer (cto) Taylor asked inmate to "cuff up" so that he could be placed on suicide watch. I refused and the Emergency Response Team was activated to remove me from my cell.

**ANSWER: Defendants admit that on January 2, 2023, the Emergency Response Team (ERT), including Defendants, was activated to respond to an incident involving Plaintiff in Dorm 8, A-wing, an operational unit at that time. Defendants lack knowledge or information sufficient to form a belief as to the truth of CTO Taylor's specific actions or Plaintiff's refusal, as Defendants were not present for that interaction. Defendants deny any remaining allegations in paragraph 5 not expressly admitted.**

6.      When the ERT arrived at my cell door I immediately noticed that they were already wearing their combat gear and gas mask. This was unusual because the ERT does not usually put that gear on until they have assessed that force is necessary.

**ANSWER: Defendants object to "combat gear" as a mischaracterization of standard ERT equipment and to "unusual" as an unsupported opinion. Defendants admit arriving at Plaintiff's cell wearing helmets, gas masks, and protective gear—standard protocol for all tactical activations—including Plaintiff's extraction on January 2, 2023. Defendants deny this was "unusual" or suggestive of premeditated force, as such gear is worn preemptively per IDOC policy. Defendants deny any remaining allegations in paragraph 6 not expressly admitted.**

7.      The reason that they were already wearing that gear was because they intended to use force to hurt me whether that force was necessary or not.

**ANSWER: Deny.**

8.      The Emergency Response team is a six officer team and one of the team members is designated as the camera person. This officer holds a handheld camera to film everything that happens.

**ANSWER: Defendants admit that the ERT typically comprises six officers and that, for tactical activations like this incident, one member is assigned as a camera operator to film the event as is standard procedure per IDOC protocol.**

9.      The ERT arrived at my cell door and asked me to "cuff up." I responded by asking them to show where the camera person was. I asked them that because it was strange for them to already be wearing their tactical gear and I wanted everything on film.

**ANSWER**: **Defendants object to this paragraph as speculative regarding Plaintiff's stated motive and perception of their gear as "strange." Defendants admit that the ERT squad leader directed Plaintiff to "cuff up" upon arrival, per protocol. Defendants lack knowledge or information sufficient to form a belief as to the truth of whether Plaintiff requested to see a camera person. Defendants deny any remaining allegations in paragraph 9 not expressly admitted.**

10. The camera officer stepped up and then I proceeded to swallow an open paperclip in which I had been cutting myself with.

**ANSWER**: **Defendants admit a camera operator was present, as is standard procedure per IDOC protocol. Defendants lack knowledge or information sufficient to form a belief as to the truth of whether a "camera officer stepped up" or whether Plaintiff swallowed a paperclip. Defendants deny any remaining allegations in paragraph 10 not expressly admitted.**

11. I was then told to "cuff up" Again. And I fully complied by turning my back to the door and placing my hands through the food port while my hands were behind my back. The ERT Placed handcuffs on my wrist.

**ANSWER**: **Defendants admit that the squad leader again ordered Plaintiff to "cuff up," and Plaintiff eventually complied by placing his hands through the food port. Defendants applied handcuffs—one per wrist—per standard procedure. Defendants deny that Plaintiff "fully complied" as his actions prompted ERT activation. Defendants admit that Plaintiff's cooperation, as detailed in paragraph 11, enabled Defendants to initially cuff him.**

12. The food port is a small rectangular opening cut in the door at a little above waist level. Its purpose is to provide officers with a way to give inmates their food trays without having to actually open the door.

**ANSWER**: **Admit.**

13. They handcuffed me behind my back and they told me to kneel down on my knees. Inmates are told to kneel so that shackles can be placed on their ankles and by kneeling, the inmate poses no threat when the door is opened.

**ANSWER**: **Defendants object to "shackles" as a mischaracterization of leg irons and to "poses no threat" as speculative, since restrained inmates can still pose risks. Defendants admit that after handcuffing Plaintiff, the squad leader ordered him to kneel to apply leg irons, a standard step before opening the door. Defendants deny that an "inmate poses no threat when the door is opened." Defendants deny any remaining allegations in paragraph 13 not expressly admitted.**

14. While handcuffed behind my back, I began to kneel down, but one of the officers said "No" and then the officer who was holding the handcuff chain that was on my wrist pulled up on the handcuffs.

3

**ANSWER: Defendants admit Plaintiff began to kneel after handcuffing. Defendants deny any officer said "No" to interrupt Plaintiff's kneeling. Defendants deny that anyone "pulled up on the handcuffs"; it is inconsistent with Defendants' training and procedure to safely and effectively contain such a potentially dangerous situation. Defendants deny any remaining allegations in paragraph 14 not expressly admitted.**

15. When an officer pulls up on a handcuffs while an inmate is handcuffed behind his back, the inmate is forced to either stand up or get his shoulder dislocated.

**ANSWER: Defendants deny paragraph 15 as an exaggerated and speculative assertion. Any upward pressure would only occur to counter resistance (e.g., a headbutt), not to dislocate a shoulder, and no such action took place here.**

16. I was forced to stand up even though the same officers had just given me the order to kneel down. Protocol dictates that I should be told to kneel down so that ankle shackles can be put on and to minimize any threat to officers.

**ANSWER: Defendants object to "forced to stand up" and "protocol dictates" as speculative and conclusory, and to "shackles" as inaccurate. Defendants deny forcing Plaintiff to stand, as this would contradict the logical sequence of applying leg irons. Any deviation from kneeling was due to Plaintiff's behavior, not Defendants' actions. Defendants deny any remaining allegations in paragraph 16 not expressly admitted.**

17. The reason that they stopped me from kneeling down is because they were being filmed and they wanted to use force maliciously and sadistically to hurt me in this encounter.

**ANSWER: Defendants object to this paragraph as speculative, conclusory, and containing an improper legal conclusion regarding the phrase "maliciously and sadistically." Defendants deny stopping Plaintiff from kneeling due to filming or any reason whatsoever. Defendants admit that a camera operator filmed the incident in line with IDOC protocol but assert that their actions were in good faith to manage the situation, with any force being necessary and proportional. Defendants deny any remaining allegations in paragraph 17 not expressly admitted.**

18. After they stopped me from kneeling down, CTO Harmon and CTO Boothe opened the cell door and ushered me further back into my cell. They did this because other inmates can see what is going on if they moved me into the hallway. I fully cooperated with everything I was told to.

**ANSWER: Defendants object to the visibility assertion as speculative. Defendants deny that any member of the ERT stopped Plaintiff "from kneeling down." Defendants admit opening the cell door after handcuffing Plaintiff to apply leg irons. Defendants deny "ushering" Plaintiff further back, as no such movement was necessary absent an obstruction, and the process occurred near the door. Defendants admit Plaintiff's eventual compliance with cuffing but deny "full" cooperation with "everything" given the ERT's involvement. Defendants deny any remaining allegations in paragraph 18 not expressly admitted.**

4

19. Again, I was told to kneel on my knees, but again someone said "no" while the other officer who was holding a handcuffs pulled up and I was forced to stand up.

**ANSWER: Defendants admit that Plaintiff was directed to kneel for leg irons. Defendants deny that anyone said "no" or pulled the handcuffs and "forced" Plaintiff to stand. Defendants deny any remaining allegations in paragraph 19 not expressly admitted.**

20. While standing straight up with my hands cuffed behind my back, CTO Harmon and CTO Boothe each grabbed one of my ankles and pulled my legs from under me at the same time.

**ANSWER: Defendants deny that Plaintiff was "standing straight up." Defendants deny grabbing Plaintiff's ankles and pulling his "legs from under" him maliciously or simultaneously. Defendants admit assisting with leg irons in a controlled manner per IDOC training and protocol to guide Plaintiff to his knees—not yanking his legs. Defendants deny any remaining allegations in paragraph 20 not expressly admitted.**

21. Pulling my legs from under me while being handcuffed behind my back and standing straight up caused me to land hard on my shoulder.

**ANSWER: Defendants object to the causation assertion as speculative. Defendants deny pulling Plaintiff's legs in a manner causing him to "land hard" on his shoulder. Any contact with the floor resulted from Plaintiff's resistance or instability; and Defendants' actions were controlled and necessary per protocol. Defendants deny any remaining allegations in paragraph 21 not expressly admitted.**

22. My shoulder hit the floor hard and I was in so much pain that I tried to roll off the injured shoulder. One of the officers then hit me in the face and said "stop resisting."

**ANSWER: Defendants deny that Plaintiff's shoulder "hit the floor hard" due to their actions. Defendants deny that any officer struck him in the face. Defendants lack knowledge or information sufficient to form a belief as to the truth of whether an officer said, "stop resisting." Defendants lack knowledge or information sufficient to form a belief as to the truth of Plaintiff's subjective pain or movements but deny that their actions caused Plaintiff any injury. Defendants deny any remaining allegations in paragraph 22 not expressly admitted.**

23. The force used in this incident was not in a good faith effort to maintain order because I complied with every order that was given to me by staff.

**ANSWER: Defendants object to this paragraph as an improper legal conclusion and speculative. Defendants deny that any force used was excessive or lacked good faith. Defendants assert that any force was reasonable to address Plaintiff's initial noncompliance and potential instability, per protocol. Defendants deny that Plaintiff "complied with every order."**

5

24. If the officer's goal was to get me to kneel down so that they could put on the ankle shackles, then why did they stop me twice from kneeling down? obviously they had other intentions.

**ANSWER: Defendants object to this paragraph as rhetorical, speculative, and conclusory, and to "shackles" as inaccurate. Defendants deny stopping Plaintiff from kneeling at any time, let alone "twice"—as such an action contradicts established protocol following in this situation and the ERT's ability to apply leg irons appropriately and efficiently. Any interruption stemmed from Plaintiff's behavior, not ulterior motives. Defendants deny any remaining allegations in paragraph 24 not expressly admitted.**

25. Their intentions from the beginning of this encounter was to hurt me by using malicious and sadistic force, whether it was necessary or not.

**ANSWER: Defendants object to this paragraph as speculative and containing an improper legal conclusion regarding "malicious and sadistic" intent. Defendants deny any intention to hurt Plaintiff. Defendants affirmatively assert that their actions were in good faith and that any force used was necessary, proportional, and consistent with IDOC training and protocol to restore order and safety. Defendants deny any remaining allegations in paragraph 25 not expressly admitted.**

26. I was sent to the doctor about my shoulder and was given an MRI. The doctor says that I now have arthritis in my shoulder. I have to take pain pills because sometimes I cannot even lift my arm. I did not have this problem with my shoulder before this incident.

**ANSWER: Defendants object to this paragraph as containing an unsupported medical conclusion regarding any causal link to "arthritis." Defendants lack knowledge or information sufficient to form a belief as to the truth of whether Plaintiff was sent to a doctor, received an MRI, was diagnosed with arthritis, prescribed pain pills, or had no prior shoulder issues. Defendants deny that their actions on January 2, 2023 caused Plaintiff any shoulder injury. Defendants deny any remaining allegations in paragraph 26 not expressly admitted.**

27. It is definitely repugnant to the conscious for officers to give on inmate orders and when they see him obeying those orders, for them to stop him so that they can use malicious and sadistic force to hurt him.

**ANSWER: Defendants object to this paragraph as speculative, conclusory, and containing an improper legal conclusion regarding "malicious and sadistic" force. Defendants affirmatively deny stopping Plaintiff from obeying orders for any reason whatsoever. Defendants assert their actions were reasonable and in good faith per protocol, with no intent to harm Plaintiff at any time. Defendants deny any remaining allegations in paragraph 27 not expressly admitted.**

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6

28. The Plaintiff has exhausted his administrative remedies with respect to this claim and all defendants

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of whether Plaintiff fully and properly exhausted his administrative remedies per 42 U.S.C. § 1997e(a) and therefore deny the same.**

## CLAIMS FOR RELIEF

A. Award of $25,000 in compensatory damages against CTO Hamon for the physical and emotional injuries sustained as a result of him pulling inmate Wynn's legs from under him, using excessive force
B. Award of $25,000 in punitive damages against CTO Harmon for the physical and emotional injuries sustained as a result of his actions.
C. Award of $25,000 in compensatory damages and $25,000 in punitive damages against CTO Boothe for the physical and emotional injuries sustained as a result of him pulling inmate Wynn's legs from under him, using excessive force.
D. Grant such other relief as it may appear the plaintiff is entitled.

**ANSWER: Defendants deny that Plaintiff is entitled to any damages or relief whatsoever. Defendants deny pulling Plaintiff's legs from under him using excessive force or causing injuries. Defendants deny any malice warranting punitive damages under 42 U.S.C. § 1983. Defendants deny any remaining allegations in the Claims for Relief not expressly admitted.**

## GENERAL DENIAL

Defendants expressly deny any allegation in the Amended Complaint not specifically admitted herein.

## JURY DEMAND

Defendants demand a trial by jury on all issues so triable.

## AFFIRMATVE DEFENSES

**First Affirmative Defense:** Plaintiff, an incarcerated individual at the time of filing, is barred from pursuing these claims to the extent he failed to fully and properly exhaust administrative remedies available to him prior to initiating this lawsuit, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), and *Perez v. Wisconsin Dep't of Corr.*, 182 F.3d 532 (7th Cir. 1999).

**Second Affirmative Defense:** Pursuant to the doctrine of sovereign immunity under the Eleventh Amendment, Plaintiff is barred from seeking monetary damages from Defendants in their official capacities and from asserting any State law claims that arise solely from the exercise of their duties as State employees.

**Third Affirmative Defense:** At all times relevant herein, Defendants acted in good faith within the scope of their official duties and did not violate any clearly established constitutional or

statutory right of Plaintiff of which a reasonable person would have known. Defendants are therefore protected from liability by the doctrine of qualified immunity.

**Fourth Affirmative Defense:** Plaintiff's claims are barred to the extent they seek to impose liability on Defendants for the actions of subordinates or other ERT members in which Defendants were not personally involved, as *respondeat superior* is not a basis for liability under 42 U.S.C. § 1983. *See Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).

Dated: March 17, 2025

KWAME RAOUL
Attorney General of Illinois

Respectfully submitted,

By: /s/ *Carl S. Stier*
CARL S. STIER
Assistant Attorney General
Office of the Illinois Attorney General
General Law Bureau
115 S. LaSalle St.
Chicago, Illinois 60603
carl.stier@ilag.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Iverson Wynn (R-43733), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 23-cv-16955 |
| | ) | |
| v. | ) | Honorable Steven C. Seeger |
| | ) | |
| Ronell Harmon, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**CERTIFICATE OF SERVICE**

The undersigned certifies that on March 17, 2025, he electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system and caused to be mailed by the U.S. Postal Service a copy of the same, in an envelope fully prepaid and properly addressed to the following non-registered CM/ECF participant:

**Iverson Wynn**
Pontiac Correctional Center
R-43733 P.O. Box 99
Pontiac, IL 61764

By: */s/Carl S. Stier*
CARL STIER
Assistant Attorney General
General Law Bureau
Office of the Illinois Attorney General
115 South LaSalle Street,
Chicago, Illinois 60603
(773) 835-0637
Carl.Stier@ilag.gov