**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IVERSON WYNN (R43733), | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 23-cv-16955 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| RONELL HARMON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION AND ORDER**

Iverson Wynn, an inmate at Joliet Treatment Center, cut himself with a paperclip. And then, he swallowed it. Wynn wanted attention from the facility's crisis team. He got it.

Correctional officers put Wynn on a crisis watch. They tried to calm him down, and tried to coax him to move to a cell for inmates suffering from a mental health crisis. But Wynn refused to budge, and the officers worried that Wynn might harm himself again.

Wynn said that he would only "cuff up" if the tactical team arrived. The officers responded by calling the facility's tactical team to transfer him. Before long, the tactical team arrived on the scene, equipped with a body camera to record the entire encounter.

Things didn't go smoothly. In fact, they went from bad to worse. Wynn refused to put his hands through the door to put on handcuffs. Instead, Wynn took out a battery, and made it visible for all to see.

And then, Wynn swallowed the battery.

After swallowing the battery, Wynn allowed the officers to handcuff him. The officers opened the cell door and repeatedly ordered him to kneel so that they could place restraints around his legs. Wynn refused.

As officers shouted for Wynn to kneel, two members of the tactical team – Officers Tyler Boothe and Ronell Harmon – entered the cell. They grabbed Wynn's legs and forced him to the ground. The officers placed restraints on Wynn, and helped him back up.

With Wynn secured, officers escorted him down the hall and into another room, where he sat to talk to medical staff. He told the medical staff that he had swallowed a battery on camera.

Wynn didn't suffer long-term health problems from swallowing the paperclip or the battery. But Wynn does have ongoing shoulder pain. And he believes that Boothe and Harmon caused his shoulder problems when they forced him to the ground.

Wynn sued Boothe and Harmon in their individual capacities under section 1983. He alleges that they used excessive force in violation of the Eighth Amendment.

After discovery, Boothe and Harmon moved for summary judgment. For the reasons stated below, the motion for summary judgment is granted.

### Background

Iverson Wynn is incarcerated with the Illinois Department of Corrections. *See* Defs.' Statement of Material Facts, at ¶ 1 (Dckt. No. 86); Pl.'s Resp. to Defs.' Statement of Material Facts, at ¶ 1 (Dckt. No. 102).[1]

On January 2, 2023, Wynn resided at the Joliet Treatment Center ("JTC"), which serves male inmates who suffer from severe mental illness. *See* Pl.'s Resp. to Defs.' Statement of

---

[1] Wynn did not restate Defendants' factual assertions in his response as required by Local Rule 56. Instead, he simply offered his responses. But Wynn did number his responses to line up with the Defendants' statement of facts. And this Court could follow along. Plaintiff handwrote his responses, and he is *pro se*, so the Court will not hold the failure to follow the rules against him.

Material Facts, at ¶¶ 2–3 (Dckt. No. 102); Illinois Department of Corrections, *Joliet Treatment Center*, https://idoc.illinois.gov/facilities/multisecuritymultidisciplinarytreatment/facility.joliet-treatment-center.html (last visited July 14, 2026).

Wynn wanted to get the attention of the crisis team. *See* Pl.'s Resp. to Defs.' Statement of Material Facts, at ¶ 4 (Dckt. No. 102). So, he cut himself with a paperclip. And then, he swallowed it. *Id*.

The attempt to get attention worked like a charm. The staff put Wynn on a ten-minute "crisis watch," and tried to deescalate the situation. *Id*. at ¶¶ 3, 5.

Correctional officers tried to convince Wynn to move to a crisis cell, meaning a special cell for inmates with mental health crises. *Id*. at ¶¶ 2, 5. Wynn refused. *Id*. at ¶ 6. He told one of the officers that he would "only cuff up" for the emergency response team, adding that he "wanted to be moved by the JTC tactical team." *Id*. at ¶¶ 6–7.

Wynn rejected attempts to move him to a crisis cell, and the staff decided that Wynn posed a risk to himself. *Id*. at ¶ 8. So, they called for the JTC tactical team to move him. *Id*. Defendants Tyler Boothe and Ronell Harmon responded to the call as members of the tactical team. *Id*. at ¶¶ 2, 9.

The tactical team came prepared. They wore their standard gear, including helmets, body armor, and gas masks. *Id*. at ¶ 11. Before going to the cell, the tactical team turned on their body cams. *See generally* Video (Dckt. No. 90).

The video begins with one of the officers speaking to the camera. *Id.* The officer said the date, and memorialized the fact that Wynn was on a crisis watch and refused to move cells. *Id.* at 0:01-24. The camera then panned out to show the rest of the crisis team. The voice

3

identified the other officers, including Boothe and Harmon. *Id.* at 0:24-40. From there, the team began walking down the hallway toward Wynn's cell. *Id.* at 1:00 – 3:00.

When the team first arrived, Wynn was visible on the video, but not by much. The footage showed him peering through the slender glass window on the large metal cell door.

The officers told Wynn to place his hands through his cell door so that they could handcuff him. *Id.* at 3:00-50. Wynn refused.

Wynn took out a battery, and showed it to the officers. *Id.* at 3:45 – 4:10. And then, Wynn put the battery in his mouth and swallowed it. *Id.* at 3:45 – 4:10. The parties agree that Wynn "swallowed a battery in front of them." *See* Pl.'s Resp. to Defs.' Statement of Material Facts, at ¶ 10 (Dckt. No. 102).

The footage didn't capture Wynn swallowing the battery. But the audio fills in the gaps. You can hear Wynn yell something about a battery. It sounds like Wynn asks the officers twice, "can you see what I'm doing here?" *See* Video 3:43-50 (Dckt. No. 90). An unknown female officer responded, "yes I can." *Id.*

Wynn then asks, "so you can see my swallow this battery, right?" *Id.* at 3:54-58. The same female officer responds, "yes." *Id.* She then says something along the lines of "resident Wynn is saying he is going to swallow the battery." *Id.* at 4:01-04. And again: "Resident Wynn is putting the battery in his mouth to swallow." *Id.* at 4:04-07.

After swallowing the battery, Wynn becomes more compliant, at least temporarily. A male officer asked Wynn to stick his hands out. *Id.* at 4:07-12. Wynn let the officers handcuff him through the door. *See* Pl.'s Resp. to Defs.' Statement of Material Facts, at ¶ 10 (Dckt. No. 102).

4

Once he was cuffed, the officers opened the cell door and ordered Wynn to kneel. *Id*. at ¶¶ 13–14. Wynn didn't comply. So the officers said it again and again. The audio captured the officers directing Wynn to "kneel down" at least 10 times. *Id.* at 4:42-54.

Wynn stayed on his feet, and didn't kneel.

As Wynn now tells it, he suffered from knee problems and needed help kneeling down. *See* Pl.'s Resp. to Defs.' Statement of Material Facts, at ¶ 15 (Dckt. No. 102). But Wynn said no such thing to the officers. He didn't reveal that he had knee problems. He simply said "my legs, my legs man" to the officers. *See* Video, at 4:50-55 (Dckt. No. 90).

After multiple officers shouted for Wynn to kneel, Harmon and Boothe entered Wynn's cell, and forced Wynn down to the ground. *Id*. at ¶ 16; *see also* Video, at 4:55 – 5:35 (Dckt. No. 90). The officers never struck, punched, or kicked Wynn. *See* Pl.'s Resp. to Defs.' Statement of Material Facts, at ¶ 18 (Dckt. No. 102). But Wynn takes issue with how the officers forced him to the ground.

Harmon and Boothe used "approved leverage techniques." *See* Pl.'s Resp. to Defs.' Statement of Material Facts, at ¶ 17 (Dckt. No. 102). That means, they grabbed Wynn by the ankles and began "yanking" his legs from under him. *Id*. at ¶ 16. According to Wynn, his right shoulder hit the wall and floor as he fell. *Id*.

The video captured footage from outside the cell, and the video doesn't exactly show how the officers got Wynn to the ground. *See* Video, at 4:55 – 5:00 (Dckt. No. 90). One of the officers went around to the side of Wynn, and wasn't facing the camera. *Id.* at 4:50 – 5:00. The other officer remained by Wynn's side in the foreground, and kneeled down himself. *Id.* Wynn then swiftly dropped to the ground. *Id.* The interaction took less than ten seconds. *Id.* at 4:51-58.

5

By the look of things, the fall to the ground was not especially violent or dangerous. It wasn't a takedown by the middle linebacker of the Chicago Bears. It looked like what you'd expect if someone took your feet out.

The front of Wynn's body fell onto a mattress leaning against the wall. *See* Video, at 4:55 – 5:00 (Dckt. No. 90). Once on the ground, the officers placed restraints on his legs. *Id*. at 5:01-40.

The officers helped Wynn stand up. *See* Pl.'s Resp. to Defs.' Statement of Material Facts, at ¶ 19 (Dckt. No. 102). The officers then escorted him down the hallway, leading him to a table, where he sat and talked with medical personnel. *Id*. at ¶¶ 20–21.

Wynn told a nurse that he cut himself and swallowed a battery "on camera." *See* Video, at 9:15 – 11:00 (Dckt. No. 90); *see also* Pl.'s Resp. to Defs.' Statement of Material Facts, at ¶ 17 (Dckt. No. 102).

 Eleven days later, on January 13, 2023, a nurse practitioner examined Wynn for shoulder pain. *See* Pl.'s Resp. to Defs.' Statement of Material Facts, at ¶ 26 (Dckt. No. 102); *see* Nurse Practitioner Note, Ex. 7 (Dckt. No. 86-7). The nurse found that Wynn did not have "edema, bruising or gross deformity" and had no "fracture or dislocation." *See* Nurse Practitioner Note, Ex. 7 (Dckt. No. 86-7). But the nurse noted that Wynn suffered from pain, had a "palpitation over [his] AC joint," and had a limited range of motion. *Id*.; Pl.'s Resp. to Defs.' Statement of Material Facts, at ¶ 28 (Dckt. No. 102). At the end of the exam, the nurse referred Wynn for an MRI of his right shoulder. *See* Nurse Practitioner Note, Ex. 7 (Dckt. No. 86-7).

Before Wynn had the MRI, he got into a fight with another inmate. *See* Pl.'s Resp. to Defs.' Statement of Material Facts, at ¶ 28 (Dckt. No. 102). During the fight, Wynn ended up on

the ground, and the other inmate punched him for over a minute. *Id*. at ¶ 32. The parties don't share whether the other inmate punched Wynn on his right shoulder. *Id*.

About two months after that fight, Wynn underwent the MRI for his shoulder on April 25, 2023. *Id*. at ¶ 33. The MRI revealed that Wynn's shoulder had "moderate arthritis at the AC joint" and "mild tendinosis." *Id*. After the MRI, Wynn began taking pain medication for ongoing shoulder pain. *See* Wynn Decl. in Opp. to Mtn. for Summ. J., at ¶ 40 (Dckt. No. 105). He also received a medical permit that required officers to handcuff him at his sides, rather than from behind his back. *Id.* at ¶¶ 40–41.

Wynn believes that Boothe and Harmon injured his shoulder during his cell removal. So, he sued them in their individual capacities under 42 U.S.C. § 1983. *See* Am. Cplt., at ¶¶ 3–4 (Dckt. No. 39). Wynn alleges that Boothe and Harmon used excessive force in violation of the Eighth Amendment by yanking on his legs to make him kneel. *Id*. at ¶ 28.

After discovery, Boothe and Harmon moved for summary judgment. They argue that they used reasonable force in good faith, and that no reasonable jury could conclude that their actions caused Wynn's injuries.

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

7

To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

**Analysis**

I. **Excessive Force**

The Eighth Amendment prohibits cruel and unusual punishment. *See* U.S. Const. amend. VIII. An excessive force claim under the Eight Amendment arises only "from physical force that amounts to the 'unnecessary and wanton infliction of pain.'" *See Whitaker v. Dempsey*, 144 F.4th 908, 922 (7th Cir. 2025) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)); *see also Jones v. Anderson*, 116 F.4th 669, 677 (7th Cir. 2024) ("The Eighth Amendment's protection against cruel and unusual punishments prohibits the 'unnecessary and wanton infliction of pain' on prisoners.") (quoting *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)).

The standard is both objective and subjective. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Smith v. Kind*, 140 F.4th 359, 364 (7th Cir. 2025) ("A viable Eighth Amendment claim contains both an objective and subjective component."). The conduct must be objectively

8

serious, and the defendant's state of mind must be subjectively culpable. *See Walton v. Nehls*, 135 F.4th 1070, 1074 (7th Cir. 2025) ("First, the conduct must be, objectively, sufficiently serious. Conduct is sufficiently serious – or objectively harmful – if it is incompatible with the evolving standards of decency that mark the progress of a maturing society or involve[s] the unnecessary and wanton infliction of pain. Second, the prison official must have a sufficiently culpable state of mind.") (cleaned up).

"[T]he Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."[2] *Hudson*, 503 U.S. at 9–10 (citation and internal quotations omitted). Not every "malevolent touch by a prison guard" gives rise to a federal cause of action, even if the use of force in question "may later seem unnecessary in the peace of a judge's chambers." *Id.* at 9.

A claim under the Eighth Amendment requires more than the use of excessive force. An official's use of force only qualifies as the "'unnecessary and wanton infliction of pain' if it is applied not 'in a good-faith effort to maintain or restore discipline,' but 'maliciously and sadistically to cause harm.'" *See Smith*, 140 F.4th at 366 (quoting *Hudson*, 503 U.S. at 6).

---

[2] A few district court cases in this circuit state that "[i]f no force is necessary, even *de minimis* force may not be used." *See, e.g.*, *McCloud v. Harmon*, 2020 WL 2616395, at *3 (C.D. Ill. 2020). Those cases typically rely on the Seventh Circuit's decision in *Reid v. Melvin*, 695 F. App'x 982 (7th Cir. 2017). But as Judge Valderrama capably explained in *Jackson v. Stubenvoll*, 2022 WL 991950, at *5 (N.D. Ill. 2022), that's an overly strong reading of *Reid*. The Seventh Circuit in *Reid* discussed the difference between the existence of an injury and the magnitude of the force. That magnitude of the force is what matters, not the existence of a harm. The Seventh Circuit did not give its blessing to the notion that a *de minimis* touch can give rise to a claim for excessive force under the Eighth Amendment. Any such holding would sit uncomfortably with the Supreme Court's admonition in *Hudson*.

That's a "very high state of mind." *See Wilson v. Seiter*, 501 U.S. 294, 302 (1991). That principle reflects the text of the Eighth Amendment itself – the mistreatment must be "cruel." *See* U.S. Const. amend. VIII.

A plaintiff cannot prevail merely by showing that the "use of force was unreasonable," because part of the "standard is subjective." *See Hammer v. Bortz*, 2024 WL 2559204, at *3 (7th Cir. 2024). Instead, he must produce evidence to support "a reliable inference of wantonness in the infliction of pain." *Id.*

Most of the cases in this area of the law turn on the subjective element, meaning the defendant's state of mind. "What matters – and what will generally be the decisive factor in cases such as this – is the mindset of the individual applying the force." *Lewis v. Downey*, 581 F.3d 467, 476 (7th Cir. 2009).

Eighth Amendment case law recognizes the simple truth that prisons are dangerous places. *Id.* Correctional officers often have to act fast, and respond to difficult situations in the heat of the moment. *See Smith*, 140 F.4th at 366 ("Experience shows that excessive force claims often arise in contexts where correctional officers are required to act 'in haste, under pressure, and frequently without the luxury of a second chance,' such as in quelling a riot or other disturbance.") (citation omitted).

Force is often necessary – and sometimes, a lot of force is necessary. After all, correctional officers "must balance the threat unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if guards use force." *Hudson*, 503 U.S. at 6.

A claim under the Eighth Amendment requires evidence of a defendant's intent. But "direct evidence of intent rarely exists." *See Smith*, 140 F.4th at 366. So courts "consider

10

whether circumstantial evidence could support a reasonable inference of malicious intent." *See Whitaker*, 144 F.4th at 922.

Courts look at several, non-exhaustive factors to determine whether an officer applied force in good faith. Those factors include (1) the need for force, (2) officers' reasonable perception of the inmate's threat, (3) the relationship between the need for force and the amount of force used, (4) any efforts that officers made to lessen the severity of a forceful response, and (5) the extent of the injury suffered by the inmate. *Id.*; *see also Hudson*, 503 U.S. at 7.

The record in the case at hand is lopsided. It supports only one possible outcome. The facts confirm that Wynn has no claim.

For starters, Wynn already placed his health and safety at jeopardy by cutting himself with a paperclip, and then swallowing it. It's hard to know how much danger a person could face by ingesting a paper clip. But it can't be good. A paper clip could get stuck, or could create a blockage, or create more cuts and cause intestinal bleeding. Metal isn't on the menu, for good reason.

Swallowing a paper clip was bad, but things got worse. Wynn refused verbal commands from the officers. Wynn repeatedly rejected attempts to handcuff him, and then refused to kneel. *See* Pl.'s Resp. to Defs.' Statement of Material Facts, at ¶¶ 6–8 (Dckt. No. 102); Video, at 4:00 – 5:00 (Dckt. No. 90).

By harming himself, and then refusing to obey commands, Wynn created a need for the use of force. *See Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984) (explaining that when an "inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent or physical force"); *see also Ruiz v. Reynolds*, 2025 WL 926452, at *3 (7th Cir. 2025) (ruling that no reasonable jury could find that an officer applied a compliance

hold sadistically or maliciously where the officer "needed to remove [the inmate] from his cell to get [the inmate] to a holding cell where he could be assessed by the psychological services staff").

The situation went from bad, to worse, to more worse. Instead of obeying commands, Wynn whipped out a battery. He showed it to the officers in a very deliberate way. And then, he put it in his mouth, and swallowed it.

It's hard to know whether swallowing a battery is worse than swallowing a paperclip. But a battery can't help anyone's digestive tract. It's large. It's metal. It's electrically charged. And it's filled with chemicals.

A battery could get stuck in one's throat. Or it could get blocked in the intestinal walls somewhere. Or who knows what.

By that point, Wynn had hurt himself repeatedly. He cut himself. And he swallowed not one, but two metal objects. To top it off, he wouldn't obey verbal commands from the guards.

If anything, it's hard to know what else the guards could have done to restore order, take command of the situation, and ensure the safety of Wynn. He needed to stop harming himself. And he needed medical attention.

In his declaration, Wynn states that he had trouble kneeling. *See* Pl.'s Resp. to Defs.' Statement of Material Facts, at ¶ 15 (Dckt. No. 102). But at the time of the incident, Wynn never told the officers that he had trouble kneeling. He didn't reveal any sort of physical limitations that might have prevented him from following their instructions. He didn't tell them that they needed to take special precautions, or anything along those lines. He did say "my legs," but that's not much of a revelation.

The intent of the officers is what matters.  The officers couldn't have bad intentions based on facts that they didn't know.  *See Whitaker*, 144 F.4th at 924 ("Assuming that [the inmate] was unable to cooperate . . . [Plaintiff] has not provided any evidence that [Defendant] could or should have appreciated that.").

When acting to restrain Wynn, the officers used proportional force.  The officers only applied force to get Wynn on the ground so that they could restrain him.  The officers didn't hit Wynn, humiliate him, or apply any unnecessary physical contact.

The officers leveraged Wynn to the ground.  That's less forceful than other possible methods to gain control.  They didn't strike him, or use a stun gun or a taser, or anything in that neighborhood.  *See Lewis*, 581 F.3d at 477 ("[T]his court has previously upheld the use of a stun gun to calm a prisoner who was banging his head against a concrete bed and struggling against the guards who were attempting to restrain him." ) (citing *Dye v. Lomen*, 40 F. App'x 993, 995–96 (7th Cir. 2002)); *see also Whitaker*, 144 F.4th at 924 (finding that a "short burst of pepper spray" was proportional).

The record includes no evidence that the officers acted with malice or tried to inflict pain. It simply shows that they took him to the ground.  *See Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 619–20 (7th Cir. 2022) (ruling that sufficient evidence of excessive force existed where an officer "maliciously allowed [an inmate] to fall, intending to cause him harm").  Nothing in the record suggests that the officers wanted a hard landing.

The officers also stopped applying force to Wynn as soon as they restrained him.  *See Whitaker*, 144 F.4th at 924 ("[Defendant] stopped using the pepper spray as soon as [Plaintiff] no longer posed a threat to himself or prison staff members.").  They didn't pile on.

13

Based on the record as a whole, Wynn has not come forward with sufficient evidence that could support a finding in his favor on the subjective element of the claim.

All of the factors point in the officers' favor, and no reasonable jury could conclude otherwise. The situation presented a need for force, and the officers reasonably perceived a threat to his safety. The record lacks any evidence that the force was disproportionate. The officers tried to lessen the severity of the force. And Wynn did not suffer the sort of injury that suggests malice or other ill intent.

On this record, a reasonable jury could reach only one conclusion. The factors show that Defendants acted in a good-faith effort to restore order, maintain control, and protect Wynn's health and safety during his cell extraction. So Wynn has no Eighth Amendment claim.

## II.  Causation

Boothe and Harmon also seek summary judgment based on causation. They argue that Wynn failed to come forward with evidence that the cell extraction caused his shoulder injuries. *See* Defs.' Mem. in Supp. of Summ. J., at 5–7 (Dckt. No. 87).

This Court doesn't need to address the sufficiency of the evidence on causation, because Wynn's claim fails on other grounds.

### Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment (Dckt. No. 85).

Date:  July 31, 2026

Steven C. Seeger
United States District Judge